FILED MAR 0 1 2017

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING: (1) THE USE OF A PEN REGISTER DEVICE AND TRAP AND TRACE DEVICE; AND (2) THE ACQUISITION OF CELL-SITE INFORMATION FOR TELEPHONE NUMBER (417) 297-1232. | No. 17-PR-2004 DPR<br><br>(UNDER SEAL) |

## APPLICATION

Josephine Larison, Special Assistant United States Attorney, Western District of Missouri, (hereinafter Applicant) hereby applies to the Court pursuant to 18 U.S.C. §§ 3122, 3123, and 2703(d) for an order (1) authorizing the installation and use of a pen register and a trap and trace device (hereinafter Pen/Trap) on cellular telephone bearing number (417) 297-1232 (hereinafter the Target Telephone) and (2) authorizing disclosure of subscriber information, including the location of cellular towers (cell-site and sector/face) related to the use of the Target Telephone (hereinafter cell-site information). In support of this application, I state the following:

1. Applicant is an "attorney for the Government," as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and therefore, pursuant to 18 U.S.C. §§ 3122 and 2703(d), may apply for an order authorizing the installation and use of a Pen/Trap and acquisition of cell-site information.

2. By this application, the Government seeks an order authorizing (A) the installation and use of a Pen/Trap on the Target Telephone and (B) the acquisition of subscriber information and cell-site information related to the use of the Target Telephone. The requested information does not include GPS data, tower triangulation records, or E-911 Phase II location information.


## (A) PEN/TRAP

3. Pursuant to 18 U.S.C. § 3123(a)(1), upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a Pen/Trap anywhere within the United States, if the court finds that the attorney for the Government has certified to the court the information likely to be obtained by such installation and use is relevant to an ongoing investigation."

4. Installation and use of a pen register will record or decode dialing, routing, addressing, or signaling information transmitted from the Target Telephone. The information transmitted from the Target Telephone will include information dialing, routing, addressing, or signaling information for "push-to-talk" communications if the cellular device is push-to-talk capable, and will include dialing, routing, addressing, or signaling information for text messaging communications if the cellular device is text messaging capable. The information will also include records regarding the date, time, and duration of calls created by such incoming impulses, for a period of 60 days.

5. Installation and use of a trap and trace device on the Target Telephone will capture and record the incoming electronic or other impulses which identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the sources of wire or electronic communications. The information transmitted from the Target Telephone will include information dialing, routing, addressing, or signaling information for "push-to-talk" communications if the cellular device is push-to-talk capable, and will include dialing, routing, addressing, or signaling information for text messaging communications if the cellular device is text messaging capable. The information will also include records regarding the date, time, and duration of calls created by such incoming impulses, for a period of 60 days.

## (B) SUBSCRIBER AND CELL-SITE INFORMATION

6. Pursuant to 18 U.S.C. § 2703(d), a court may order an electronic communication service to disclose non-content information about a customer or subscriber if the Government "offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation."

7. Cellular telephone companies routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage. These records typically include for each communication a customer makes or receives (1) the date and time of the communication, (2) the telephone numbers involved, (3) the cell tower to which the customer connected at the beginning of the communication, (4) the cell tower to which the customer was connected at the end of the communication, and (5) the duration of the communication. The records may also, but do not always, specify a particular sector of a cell tower used to transmit a communication.[1] Cell-site information is useful to law enforcement because of the limited information it provides about the general location of a cell phone when a communication is made. As one court has explained:

> The information does not provide a "virtual map" of the user's location. The information does not pinpoint a user's location within a building. Instead, it only identifies a nearby cell tower and, for some carriers, a 120-degree face of that tower. These towers can be up to 10 or more miles apart in rural areas and may be up to a half-mile or more apart even in urban areas.

---

[1] Cell towers are often divided into three 120° sectors, with separate antennas for each of the three sectors. To the extent this information does exist in a particular instance, it does not provide precise information regarding the location of the cell phone at the time of the communication, but instead shows only in which of the three 120°, pie-shaped sectors the phone was probably located.

3

*In re Application of United States for an order for Disclosure of Telecommunications Records,* 405 F. Supp. 2d 435, 449 (S.D.N.Y. 2005) (citation omitted).

8. Applicant certifies the United States Drug Enforcement Administration (DEA) is conducting a criminal investigation of Daniel VALLEJO and others known and unknown, in connection with possible violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, distribution of, possession with the intent to distribute, and conspiracy to distribute, controlled substances. It is believed one or more of the subjects of the investigation are using the Target Telephone, a cellular telephone issued by T-Mobile, subscribed to by "Justin Case" with an address of 920 South Monroe, Avenue, Joplin, Missouri, and used by VALLEJO in furtherance of the subject offenses.

### (C) SPECIFIC ARTICULABLE FACTS

9. In support of its request for an order under 18 U.S.C. § 2703(d) directing the furnishing of subscriber and cell-site information, and based upon discussions with DEA Task Force Officer (TFO) Jason Carter, and Missouri State Highway Patrol Sergeant Jamie Musche, Applicant sets forth the following specific and articulable facts establishing that there are reasonable grounds to believe that the Pen/Trap and cell-site information sought is relevant and material to an ongoing criminal investigation:

   a. On December 30, 2016, Sergeant Musche arrested Carrie A. PENATE at her residence located at 2312 County Lane 137, Carthage, Missouri, pursuant to a felony warrant for possession of a controlled substance issued out of Oklahoma, along with four misdemeanor warrants for local ordinance violations.

   b. After arresting PENATE, Sergeant Musche transported her to the MSHP Troop D Satellite Office in Carthage, Missouri. Once at the Satellite Office, Sergeant Musche

4

advised PENATE of her *Miranda* rights and conducted an interview of PENATE. PENATE stated she is from California and she knows John G. MARTINEZ. PENATE grew up with MARTINEZ in California. PENATE stated that approximately one year ago, MARTINEZ contacted PENATE and her girlfriends in Joplin, Missouri, via Facebook. PENATE stated MARTINEZ started contacting PENATE's friend, Kiley M. CARPENTER. MARTINEZ wanted to meet CARPENTER, so in July 2016, PENATE and CARPENTER traveled to California with Joel BELL, Lee WILLIAMS, and Katie BRUMMETT.

c. PENATE stated a couple weeks after she returned from California, CARPENTER told her that BELL was receiving methamphetamine from MARTINEZ in the mail and sending cash back to him.

d. Earlier, on December 22, 2016, in a post-*Miranda* interview with BELL, he had admitted to Sergeant Musche he had gone on the California trip with PENATE and later received methamphetamine from MARTINEZ through the mail.

e. On January 12, 2017, Sergeant Musche obtained a search warrant for a suspect package being shipped from West Sacramento, California, to Ashley Blair, 603 Cherry Street, Carl Junction, Missouri. Based on the ongoing investigation, Sergeant Musche believed MARTINEZ had shipped the package. Upon opening the package, Sergeant Musche found approximately eight (8) ounces of methamphetamine. A small bag containing a representative sample of the methamphetamine was left in the package and the package was released to Ozark Drug Enforcement Taskforce (ODET) TFO Chad Allison for a controlled delivery to 603 Cherry Street.

5

f. Later that day, TFO Allison approached the front door of 603 Cherry Street and knocked on the door. The door was opened by a white female, later identified as Jessica PALMER. TFO Allison asked PALMER if she was Ashley Blair and she stated she was. TFO Allison requested PALMER sign a FedEx package receipt form and she did so. PALMER took custody of the box that contained a representative sample of methamphetamine and went back inside the trailer. A few moments later, a search warrant was served on the residence and PALMER was arrested.

g. During a post-arrest interview, PALMER stated she signed Ashley Blair's name on the package receipt form and that Blair was not involved. PALMER said she paid Blair for letting PALMER use her house to receive the package. PALMER told investigators the methamphetamine was supplied by MARTINEZ. PALMER has never met MARTINEZ and did not know if that was his real name.

h. PALMER stated that over the past few weeks she had received three packages containing methamphetamine, including the one from earlier that day. MARTINEZ had contacted her via Facebook messenger, but she did not know how MARTINEZ got her name. MARTINEZ told her he would send her methamphetamine if PALMER would send him money. MARTINEZ had PALMER send half of the money up front before MARTINEZ sent the first package. PALMER sold and/or used all the methamphetamine that was sent in the packages. The two previous packages MARTINEZ sent to PALMER each contained four ounces of methamphetamine. MARTINEZ would send PALMER the tracking number for the packages he was sending. PALMER would not receive any more until she paid MARTINEZ. In addition to Facebook messenger, PALMER also

6

communicated with MARTINEZ on the telephone. PALMER had talked to MARTINEZ on the telephone on the day of the package delivery.

i. PALMER paid money or methamphetamine to friends of hers who would send money to MARTINEZ. PALMER had people send MoneyGrams from Wal-Mart or go to a credit union to deposit money into MARTINEZ's account. PALMER had been to the credit union a couple times and had taken people there to deposit money. Individuals sending money had to use their real names when sending money because they had to show identification.

j. Sergeant Musche learned that the individuals were using Joplin Metro Credit Union to make the cash deposits of drug proceeds generated from the methamphetamine supplied by MARTINEZ.

k. Sergeant Musche contacted employees at Joplin Metro Credit Union and obtained a list of individuals who had made deposits at Joplin Metro Credit Union into a "shared branch" account with Golden 1 Credit Union owned by MARTINEZ. A shared branch account allows withdrawals or deposits into or from affiliate branches.

l. Joplin Metro Credit Union provided information on the following deposits to MARTINEZ's account at Golden 1 Credit Union: On February 13, 2017, Daniel VALLEJO deposited $500 cash. On February 17, 2017, VALLEJO deposited $250 cash. On February 21, 2017, VALLEJO deposited $1,650 cash. On February 23, 2017, VALLEJO deposited $1,700 cash. On February 24, 2017, VALLEJO deposited $1,700 cash. On each occasion, VALLEJO provided (417) 297-1232, the Target Telephone number, to Joplin Metro Credit Union employees as his contact number.

m.  In her December interview with Sergeant Musche, PENATE said she had heard that Kristina THOMPSON was also receiving packages from MARTINEZ. The same records from Joplin Metro Credit Union showed that THOMPSON had made deposits into MARTINEZ's account twice in December totaling $950, and one on January 30, 2017, for $500.

n.  On February 27, 2017, PENATE told Sergeant Musche that VALLEJO had left Carthage, Missouri, sometime over the weekend with an individual known as "Sergio." PENATE had been told by CARPENTER, who is VALLEJO's girlfriend, that CARPENTER could not locate VALLEJO. Another man named Dustin TEETER had told PENATE that VALLEJO and "Sergio" had gone to California with the intent to obtain approximately four pounds of methamphetamine from MARTINEZ and transport the methamphetamine back to the Joplin, Missouri, area. PENATE provided the Target Telephone number as VALLEJO's contact number.

o.  On February 27, 2017, TFO Carter contacted T-Mobile and received confirmation that T-Mobile is the service provider for the Target Telephone and that the Target Telephone is active. The listed Target Telephone's subscriber is "Justin Case," with an address of 920 South Monroe Avenue, Joplin, Missouri. PALMER'S current home address is 920 South Monroe.

p.  On February 28, 2017, Sergeant Musche was contacted by a known and reliable confidential informant (CI). The CI has been proven to be reliable in the past. Sergeant Musche has worked with the CI in a previous investigation in which he corroborated the information provided by the CI with his independent investigation. On February 28, 2017, the CI told him that THOMPSON had instructed him/her to contact Jimmy

8

REEDY to gather money together because a large amount of methamphetamine would be arriving in Joplin in approximately two days.

q. On February 28, 2017, Sergeant Musche went to the McDonald County, Missouri, Jail to speak to Craig WITTINGTON. WITTINGTON had been arrested in McDonald County after attempting to flee from law enforcement with approximately a half ounce of methamphetamine and a firearm. In a post-*Miranda* interview, WITTINGTON admitted that he was working with VALLEJO to distribute methamphetamine that VALLEJO was receiving from MARTINEZ and that he and VALLEJO primarily communicate via text message about their distribution activity. WITTINGTON did not know VALLEJO's cellular telephone number.

10. In accordance with 18 U.S.C. § 3121(c), Applicant has informed the DEA it shall use technology reasonably available to it to restrict the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communication.

11. Based upon the above facts, and pursuant to 18 U.S.C. §§ 3127, 2703(c)(1)(B), 2703(c)(2), and 2703(d), because there are reasonable grounds to believe such information is relevant and material to an ongoing criminal investigation, Applicant requests that T-Mobile, and any other person or entity providing wire or electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information: (A) name; (B) address; (C) the billing names and addresses (if different); (D) means and source of payment for such service (including any credit card or bank account number); (E) historical call detail records for the period beginning on December 1, 2016,

until the date this Court's order expires; (F) historical cell site records for the period beginning on December 1, 2016, until the date this Court's order expires; and (G) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address of a subscriber, for published, non-published, or unlisted dialing, routing, addressing, or signaling information captured by the pen register on the Target Telephone, and for published, non-published, or unlisted dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the Target Telephone as captured by the trap and trace device on the Target Telephone, upon oral or written demand by agents of the DEA.

12. Based upon the above facts, and pursuant to 18 U.S.C. §§ 3127, 2703(c)(1)(B), 2703(c)(2), and 2703(d), because there are reasonable grounds to believe such information is relevant and material to an ongoing criminal investigation, Applicant requests that T-Mobile, and any other person or entity providing wire or electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the cell-site information for the Target Telephone, at call inception and call termination, including the physical address of the cellular tower, upon oral or written request of agents of the DEA. This request should specifically preclude T-Mobile from initiating any signals to the Target Telephone to determine the cell-site location for the Target Telephone and limit the information to cell-site information kept in the ordinary course of retaining subscriber information.

13. Because the assistance of T-Mobile will be necessary to accomplish the objectives of the requested order, Applicant further requests that the order direct upon service of the order upon it, T-Mobile furnish information, facilities, and technical assistance necessary to accomplish the installation of the Pen/Trap, including installation and operation of the devices

unobtrusively and with a minimum of disruption of normal service. T-Mobile shall be compensated by the DEA for reasonable expenses incurred in providing such facilities and assistance in furtherance of the order.

14. It is further requested that this authorization for the installation and use of a pen register device and trap and trace device apply not only to the telephone number listed above for the Target Telephone, but also to any changed telephone number(s) subsequently assigned to an instrument bearing the same cellular device as the Target Telephone, or any changed cellular device subsequently assigned to the same telephone number as the Target Telephone, or any additional changed telephone number(s) and/or cellular device(s), whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the Target Telephone within the period authorized by this order.

15. Applicant further requests that the Court direct the local, long distance, and wireless carriers listed in the order, and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate the execution of the order, to notify special agents of the DEA, upon oral or written request, of any and all changes (including additions, deletions, and transfers) in service regarding the Target Telephone, to include telephone numbers and subscriber information (published and non-published) associated with these service changes.

16. Applicant further requests that the Target Telephone remain active and in service, and if the Target Telephone has been targeted for deactivation due to non-payment or breach of contract, DEA will incur the future billing costs at the point of deactivation and compensate the wireless carrier for such additional billing costs beginning from the date of deactivation and continuing through the time authorized by this order.

17. Applicant further requests, pursuant to 18 U.S.C. § 3123(d), that the Court direct the local, long distance, and wireless carriers listed in the proposed order, and any other local, long distance, or wireless carrier obligated by the order to provide assistance to the DEA, not to disclose in any manner, directly or indirectly, by any action or inaction, to the listed subscriber(s) for the Target Telephone, the subscriber of the incoming calls to or outgoing calls from the Target Telephone, or to any other person, the existence of the Application, the resulting court order, in full or redacted form, or the investigation for any reason, except as required to execute the order, unless or until ordered by this Court.

WHEREFORE, IT IS REQUESTED that this Court enter an ex parte order for a period of 60 days, commencing upon the date of installation of the Pen/Trap, authorizing the installation and use of a Pen/Trap to collect the dialing, routing, addressing, and signaling information (including date and time) associated with communications to or from the Target Telephone.

IT IS FURTHER REQUESTED that the order authorize agents of the DEA to acquire, during the same 60-day period, subscriber information for the numbers captured by the pen register and trap and trace.

IT IS FURTHER REQUESTED that the order authorize agents of the DEA to acquire, during the same 60-day period, cell-site information for communications to and from the Target Telephone as well as the physical location of cellular tower(s) identified nearby.

IT IS FURTHER REQUESTED that the order direct T-Mobile to furnish the DEA forthwith all information, facilities, and technical assistance necessary to effectuate the order unobtrusively and with minimum interference to the services presently accorded the user of the Target Telephone.

IT IS FURTHER REQUESTED that this Application and the anticipated order of this Court be filed under seal, and the Court direct T-Mobile not to disclose to any person the existence of this Application, the resulting order, or the investigation for any reason, except as required to execute the order, unless or until ordered otherwise by this Court. I declare the foregoing is true and correct to the best of my belief and knowledge.

Executed on March 1, 2017

Respectfully submitted,

Tammy Dickinson
United States Attorney

By *[signature]*

Josephine M. Larison
Special Assistant United States Attorney

901 St. Louis Street, Suite 500
Springfield, Missouri 65806
Telephone: (417) 831-4406

Sworn to before me and subscribed in my presence at Springfield, Missouri, this 1st day of March, 2017.

*[signature]*

HONORABLE David P. Rush
United States Magistrate Judge
Western District of Missouri